INTERPART CORPORATION, Appellee,

v.

Imos ITALIA, Vitaloni, S.p.A. and
Torino Industries, Ltd.,
Appellants.

Appeal Nos. 84–1690, 85–878.

United States Court of Appeals,
Federal Circuit.

Nov. 14, 1985.

William C. Schubert, of Spensley, Horn, Jubas & Lubitz, Los Angeles, Cal., argued for appellee. With him on brief was Martin R. Horn, Los Angeles, Cal.

Gary A. Clark, of Pretty, Schroeder, Brueggemann & Clark, Los Angeles, Cal., argued for appellants. With him on brief were Jan P. Weir, Los Angeles, Cal., and Alex Devience, Jr., of Alex Devience, Jr., Ltd., Chicago, Ill.

Before FRIEDMAN, RICH and BISSELL, Circuit Judges.

RICH, Circuit Judge.

This appeal is from the judgment entered July 30, 1984, by the United States District Court for the Central District of California granting summary judgment to appellee Interpart Corporation (Interpart) and holding that United States Design Patent No. 263,130 for "Rear View Mirror," assigned to appellant Imos Italia, Vitaloni, S.p.A., et al. (Vitaloni), is invalid and not infringed by Interpart; that Interpart's manufacture and sale of automobile mirrors does not constitute unfair competition within the meaning of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) or within the meaning of §§ 17200, 17300, and 17500 of the California Business and Professions Code; and that Interpart is entitled to an award of attorney fees from Vitaloni for defending the patent infringement action. We *affirm-in-part*, *reverse-in-part*, and *remand*.

### Background

Interpart produces and distributes automobile rear view mirrors in the automobile aftermarket throughout the United States under the styles and trademarks "Interpart," "Mirrari 1," "Mirrari 2," "Mirrari 3," "Mirrari Oval," "Mirrari ERC," and "Mirrari VT." Imos Italia sells automobile rear view mirrors manufactured by Vitaloni in the same aftermarket under the styles and trademarks "Vitaloni," "Tornado Van," "Baby Tornado," and others. Torino exclu-

sively assembles, distributes, and sells the Vitaloni mirrors throughout the United States. Interpart admits that it copied Vitaloni's mirrors, claiming the right to do so.

Interpart filed a declaratory judgment action in the United States District Court for the Central District of California on 2 October 1980. Vitaloni filed its suit for patent infringement in the United States District Court for the Northern District of Illinois on 30 April 1982, seven months after its design patent had issued on 23 February 1982. The patent action was transferred to California and consolidated with the declaratory judgment action pursuant to Rule 42(a), Fed.R.Civ.P., by order of the court in the Central District of California.

The district court conducted several trial-like hearings on Vitaloni's motion for a temporary restraining order (TRO) against Interpart and Interpart's two separate motions for summary judgment. The court had the opportunity to hear, question, and evaluate witnesses on some of the issues in this case. The district court made twenty-one findings of fact and fourteen conclusions of law, very similar to those submitted by Interpart.

Vitaloni filed two separate appeals. The first appeal, No. 84–1690, was taken to this court from the holding that this case is exceptional and awarding attorney fees under 35 U.S.C. § 285; Vitaloni did not appeal the holding of invalidity. The second appeal, No. 85–878, was initially taken to the United States Court of Appeals for the Ninth Circuit from the unfair competition portion of the judgment. Upon Interpart's motion to transfer the second appeal to this court, and over Vitaloni's opposition, the Ninth Circuit transferred it pursuant to 28 U.S.C. § 1631 after holding that "the Federal Circuit has exclusive jurisdiction in these circumstances." The two appeals were then consolidated by stipulation of the parties.

## Issues

In addition to the threshhold question of our jurisdiction, these appeals present the following issues:

I. Whether there is a genuine issue of material fact that Interpart used photographs of Vitaloni mirrors in the Interpart brochure.

II. Whether Vitaloni may have a legally protected interest in its mirrors that would preclude Interpart from selling copies of those mirrors, absent any valid patent rights covering the Vitaloni mirrors and requiring a trial.

III. Whether California's "plug molding" statute, California Business and Professions Code § 17300, is preempted by federal law.

IV. Whether the trial court abused its discretion in holding the case exceptional under 35 U.S.C. § 285.

## OPINION

### Jurisdiction

◼ The question is whether the Federal Circuit has jurisdiction of a case involving the Lanham Act and unfair competition law, but no patent issues, that was filed in one district court and later consolidated with a patent case, between the same parties, transferred from another district court where it was filed, and then appealed. On the facts of this case, we answer this question in the affirmative.

◼ This court has jurisdiction under 28 U.S.C. § 1295 over an appeal from a final decision of a district court if the jurisdiction of the district court was based at least in part on 28 U.S.C. § 1338(a), at the time the complaint was filed, *Atari, Inc. v. JS & A Group, Inc.,* 747 F.2d 1422, 223 USPQ 1974 (Fed.Cir.1984), *cf. USM Corp. v. SPS Technologies,* 770 F.2d 1035, 1036, 226 USPQ 1038, 1039 (Fed.Cir.1985), except that this court does not have jurisdiction of a case that relates to copyrights or trademarks and no other claims under § 1338(a).

When Interpart filed its declaratory judgment action in the California federal district court, the case was one that would fall within the exception to our jurisdiction

set out in § 1295, i.e., it was not a case involving patents. It was only after the patent case was transferred from the Illinois federal district court and consolidated with the case in California that the case became one that would fall within our jurisdiction when appealed. The appeal from the consolidated case involves at least a portion of the patent claim, i.e., the award of attorney fees under 35 U.S.C. § 285, which is part of the patent statute, and jurisdiction of the case is exclusively ours. The Ninth Circuit agreed.

## Standard of Review

Summary judgment in patent cases, as in all other cases, is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See Molinaro v. Fannon/Courier Corp.,* 745 F.2d 651, 653–54, 223 U.S.P.Q. 706, 707 (Fed.Cir.1984). The movant bears the burden of demonstrating the absence of all genuine issues of material fact, and the district court must view the evidence in a light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *See United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Palumbo v. Don-Joy Co.,* 762 F.2d 969, 973, 226 U.S.P.Q. 5, 7 (Fed.Cir.1985). The party opposing summary judgment must show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient. *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.,* 731 F.2d 831, 836, 221 USPQ 561, 564 (Fed.Cir.1984). Summary judgment is authorized where it is quite clear what the truth is. *Sartor v. Arkansas Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 728, 88 L.Ed. 967 (1944).

## I. The Photographs

Vitaloni argues that Interpart used photographs of Vitaloni mirrors in the Interpart advertising brochure in contravention of §§ 17200 and 17500 of the California Business and Professions Code and § 43(a) of the Lanham Act. We disagree.

The district court found the following as fact:

There is no evidence that Interpart has used, in connection with its mirrors, any photograph of any Vitaloni mirrors which it falsely identified as being a photograph of Interpart's mirrors.

Because the question of whether summary judgment is appropriate is determined on an analysis of the facts, *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1967), we review the record in some detail.

Interpart published a brochure in late October of 1980 that depicted its line of mirrors and used it at an important trade show. Vitaloni urges that Interpart must have used Vitaloni mirrors in at least some of the brochure pictures because Interpart did not have all of the mirrors depicted in the brochure at the time the pictures were taken; they had not yet arrived from the manufacturer, Hiraoki, in Taiwan. Interpart responds that it took pictures of mockups of those mirrors which were not in its possession at that time, not of Vitaloni mirrors. The mock-ups were made from clay and other Interpart mirrors, all of their mirrors being similar enough to allow Interpart to interchange them with slight modification.

On 9 December 1981, Brian Wald, the president of Interpart, stated that the photographs of Interpart's mirrors were taken "in July-August, 1980, in that area." Fifteen months later, in March 1983, he had a chance to review Interpart invoices from Hiraoki in Taiwan. Wald stated:

Based on my subsequent review of the invoices attached to the Declaration of George S. Yueh dated April 23, 1982 and my recollection that the trade show at which the advertising brochure was first distributed occurred around the last week in October or the first week in November, 1980, I am now convinced that the photographs appearing on the last page of the advertising brochure were taken in approximately September or October, 1980 and not as early as July-August, 1980.

Wald continued by stating that he had instructed Barbara Lewis not to use photographs of competitor's products in Interpart's brochures and advertisements. Wald further declared that he authorized the advertising agency to make mock-ups of the bases of the left and righthanded versions of the Mirrari VT and left and righthanded versions of the Mirrari 3.

Barbara Lewis, whose job at Interpart was to work with the advertising agency in creating the advertisements and brochures, stated, in her declaration dated 1 February 1982, that Interpart received Mirrari 1, Mirrari 2, and Oval mirrors on about 20 April 1980. She added that she gave these mirrors to the advertising agency shortly thereafter.

At her deposition on 20 February 1982, she stated that the photography work for the first page of the brochure was done before the rest of the brochure was started but did not state when that was. The other parts of the brochure were completed "several days to a week after this one [the first page] was." She declared that she was present at only the first session and that everything was rushed because the trade show was fast approaching. The following dialogue was the only indication she gave of when the photographs were taken.

Q. And this brochure then came or at least the photographs then came what?

A. Much later.

Q. Can I say September and October?

A. Yes.

. . . .

Q. ... sometime in September or October these photographs were taken; correct?

A. Right.

Lewis next stated that the Mirrari 3, ERC, and VT mirrors were delayed from Hiraoki but that they were represented by mock-ups made from Mirrari 1's and 2's and electrical wires to represent the ERC and a clay base to simulate the VT, the work being done by the advertising agency and represented by an invoice. A complete mock-up was made for the Mirrari 3 and was represented by the same invoice.

Finally, in a second declaration and in further testimony about this case, taken on the same day as Wald's second declaration was taken, Lewis stated that she had been mistaken about the types of mirrors that had arrived on or about 20 April 1980 but that she knew samples of each had arrived before the photographs were taken. She also declared again that the photographs were taken in September or October of 1980.

George Yueh, national sales manager and general manager at the Los Angeles office of Hiraoki stated, in his declaration of 3 May 1982, that he had sent Interpart mirror samples prior to Interpart's purchasing mirrors from Hiraoki. His declaration thoroughly explained each of five invoices from Hiraoki in Taiwan which clearly show that all but the Mirrari ERC, VT, and 3 mirrors were sent from Hiraoki before 25 August 1980.

■ Based on the entire record, we agree with the district court that there is no genuine issue here: (1) Lewis stated at her deposition, three months before Yueh's declaration, and in her second declaration, that the photographs were taken in September or October of 1980, and she never said anything to the contrary; (2) both of Wald's declarations are consistent with each other and with what Lewis stated on this point; (3) the five invoices described by Yueh show indisputably that Hiraoki had sent all of the mirrors except the ERC, VT, and 3 in plenty of time for the photographs to be taken and the brochure printed; (4) Wald and Lewis were in complete agreement that mock-ups of the three missing mirrors were made, an invoice from the advertising agency supporting this, and used for the brochure photography; and (5) Wald stated that he instructed Lewis not to use competitors' products, and Lewis so instructed the advertising agency. Issue I, supra, is decided in the negative.

## II. Copying of the Vitaloni Mirrors Absent Valid Patent Rights

### A. The Lanham Act, § 43(a)

■ Vitaloni claims, in effect, that the overall shapes of its mirrors are entitled to

protection as trademarks under § 43(a) of the Lanham Act if Vitaloni can show that its mirror shapes are nonfunctional, have acquired a secondary meaning, and that likelihood of confusion exists between its mirrors and those of Interpart, regardless of whether Interpart engaged in any deceptive trade dress activity, or "dirty trick" as the district court put it. The district court's conclusions of law stated in part:

> Absent any valid patent rights in the Vitaloni design or any improper activity ("dirty trick") by Interpart, the mere copying by Interpart of the Vitaloni mirrors is legally permissible even if defendants' [Vitaloni's] mirrors have secondary meaning ... [and] even if the public is likely to be, or is actually, confused as to the source of Interpart's mirrors.

Neither view is law in the Ninth Circuit, which we apply here, see *Atari, Inc. v. JS & A Group, Inc.*, 747 F.2d 1422, 1438–40, 223 U.S.P.Q. 1074, 1086–87 (Fed.Cir.1984); a dirty trick is not a prerequisite to recovery under § 43(a) although an act of unfair competition is. *See New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1198, 202 USPQ 643, 646 (9th Cir. 1979); *Smith v. Chanel, Inc.*, 402 F.2d 562, 565, 159 U.P.S.Q. 388, 390 (9th Cir.1968).

While "[n]o Ninth Circuit precedent provides clear guidance on the protectability of overall product shapes as trademarks," *Petersen Manufacturing Co. v. Central Purchasing, Inc.*, 740 F.2d 1541, 1550, 222 U.S.P.Q. 562, 569 (Fed.Cir.1984), and, moreover, as the district court openly opined, the various Ninth Circuit cases on this point are not reconcilable, the court in *Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 210 U.S.P.Q. 351 (9th Cir.1981), provides some guidance. In *Vuitton*, an action for infringement of the Louis Vuitton luggage trademark, LV, that court reaffirmed what the Ninth Circuit said over thirty years ago in *Pagliero v. Wallace China Co.*, 198 F.2d 339, 343, 95 U.S.P.Q. 45, 48 (9th Cir.1952): "[i]mitation

of the physical details and designs of a competitor's product may be actionable if the particular features imitated are 'nonfunctional' and have acquired a secondary meaning" and quoted with approval from *In re Deister Concentrator Co.*, 289 F.2d 496, 506, 129 U.S.P.Q. 314, 323 (CCPA 1961): "[w]here a shape or feature of construction is in its concept arbitrary, it may be or become a legally recognizable trademark because there is no public interest to be protected."

Notwithstanding its apparent affirmation of trademark protection for overall shape, and in recognition of the public right to copy, the Ninth Circuit has long espoused the principle that "[i]n any proceeding under the Lanham Act the gist of the proceeding is a 'false description or representation,' 15 U.S.C.A. § 1125(a) [§ 43(a) ]...." *Smith v. Chanel*, 402 F.2d at 565, 159 U.S.P.Q. at 390 (quoting *Societe Comptoir de L'Industrie Cotonniere Establissements Boussac v. Alexander's Department Stores, Inc.*, 299 F.2d 33, 36 (2d Cir.1962)).\*

Vitaloni's attempt to recover under § 43(a) for unfair competition by claiming that it need show only nonfunctionality, secondary meaning, and likelihood of confusion would be successful if the facts were not, as they are here, that Interpart clearly indicated the source of its mirrors. The district court found that Interpart did not falsely describe the origin of its mirrors and that there was no evidence that Interpart did not "clearly designate itself as the manufacturer and/or clearly designate the product as one of the Mirrari line." The court had before it the boxes in which Interpart sold its mirrors. There was testimony during the proceedings, with cross examination, that Interpart used boxes that designated Interpart as the source and indicated that the contents were Mirrari mirrors for retail sales, and that plain boxes were used for sales from Sears and Mont-

---

\* *But cf. Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 317 (Fed.Cir.1985) (quoting *New West Corp. v. NYM Co. of Calif., Inc.*, 595 F.2d 1194, 1201, 202 U.S.P.Q. 643, 649 (9th Cir.1979) ("In respect of unfair competition, 'the ultimate test is whether the public is likely to be deceived or confused....'"). Neither *Pentec* nor *New West* involved protecting product shape.

gomery Ward's catalogs. The evidence was uncontroverted that every mirror, regardless of how it was sold, had a silver and black mylar label on it that read "Interpart Mirrari"; Interpart did not compete unfairly within the meaning of § 43(a) of the Lanham Act. We therefore affirm the district court's judgment on this issue.

### B. California Unfair Competition Law: Section 17500 of California Business and Professions Code

Vitaloni asserts that Interpart's copying was unfair competition under the above-captioned law. The Ninth Circuit has stated that the mere copying of a product is not actionable under California unfair competition law, although state law can preclude palming off or require that a product be labelled or other action taken to prevent customers from being misled as to source. *Tveter v. AB Turn-O-Matic*, 633 F.2d 831, 839, 209 USPQ 22, 30 (9th Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1983, 68 L.Ed.2d 300 (1981) (citing *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964)).

■ Although we recognize that Vitaloni might have a cause of action under state law if Interpart's mirrors were not labelled properly or had been palmed off as Vitaloni mirrors, we find that neither violation has occurred here and thus affirm the district court's conclusion on this issue.

### III. California Business and Professions Code § 17300: The Plug Molding Statute

#### A. Versus the Patent Law

■ Whether California's plug molding statute is preempted by federal law involves a consideration, under Ninth Circuit law, *see Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1033, 226 U.S.P.Q. 881, 893 (Fed.Cir.1985), of whether that law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. [470] 474, 94 S.Ct. 1879, 1882, 40 L.Ed.2d

315 (1973) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). The state law must fail if it "clashes with the objectives of the federal patent laws." *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 231, 84 S.Ct. 784, 788, 11 L.Ed.2d 661 (1963).

Congress was granted the power to legislate in the areas of patents and copyrights by the Constitution to "promote the Progress of Science and useful Arts." The patent law, in order to promote the useful arts, grants to inventors the right, limited in time, to exclude others from making, using, or selling their patented inventions.

■ The California plug molding statute, to the contrary, proscribes use of the product itself for a pattern or "plug" in a direct molding process. In that process, the product is entirely coated with a mold-forming substance that sets and which is then removed from the product and used as the mold for making numerous replicas of the product. This process is substantially less expensive than developing a mold from scratch, something the original product manufacturer has to do. The statute reads:

§ 17300. Unlawful acts; duplication for sale; sale

(a) It shall be unlawful for any person to duplicate for the purpose of sale any manufactured item made by another without the permission of that other person using the direct molding process described in subdivision (b) [sic, (c) ].

(b) It shall be unlawful for any person to sell an item duplicated in violation of subdivision (a).

(c) The direct molding processes subject to this section is [sic] any direct molding process in which the original manufactured item was itself used as a plug for the making of the mold which is used to manufacture the duplicate item.

(d) The provisions of this section shall apply only to items duplicated using a mold made on or after January 1, 1979.

California Business and Professions Code (West Supp.1985). It is clear from the face of the statute that it does not give the

creator of the product the right to exclude others from making, using, or selling the product as does the patent law. The statute does not preclude one from photographing, measuring, or in any way utilizing the concept of the design of the product. It does not preclude copying the product by hand, by using sophisticated machinery, or by any method other than the direct molding process. This is clear from a review of the record which includes much material bearing on the constitutionality of the statute.

The statute prevents unscrupulous competitors from obtaining a product and using it as the "plug" for making a mold. The statute does not prohibit copying the design of the product in any other way; the latter, if in the public domain, is free for anyone to make, use, or sell.

Moreover, as a predecessor of this court once stated, the patent laws "say nothing about the right to copy or the right to use, they speak only in terms of the right to exclude." *Mine Safety Appliances v. Electric Storage Battery*, 405 F.2d 901, 902 n. 2, 160 U.S.P.Q. 413, 414 n. 2 (CCPA 1969). The California law does not "clash" with the federal patent law; the two laws have different objectives. Absent an existing patent right, we see nothing in the federal patent statutes that conflicts with California's desire to prevent a particular type of competition which it considers unfair. This California statute is not preempted by federal law, contrary to the district court's conclusion.

### B. Did Interpart Violate the Statute?

The district court concluded that Interpart did not violate the plug molding statute because, as a question of fact, "[t]here is no evidence that Interpart's Mirrari line of mirrors was manufactured using a Tornado mirror as a plug for a mold." The court concluded, as a matter of law, that the statute does not prohibit a process that "employs an intermediate step which may or may not include the use of an impression, machine, or hand measurements between the original article and the mold directly used to manufacture copies of the original." We agree with that conclusion of law but not with that finding of fact. We find that there is a genuine issue of material fact as to how Interpart made its mirrors.

Both parties examined and cross examined various experts in the field before the district court. Some, for Interpart's case, testified that by observation, measurement, and materials science, they had concluded that the direct molding process was not used. Others, on Vitaloni's behalf, using the same techniques, concluded exactly the opposite. One of Vitaloni's experts, Bumm, a metrologist (an expert in making measurements), testified that the differences between the Interpart and Vitaloni mirrors were only of thousandths of an inch in most of the sixteen different measurements he took over the mirrors' surfaces to a maximum of fifty thousandths. Five of Bumm's measurements together revealed that the cavity (where the reflective glass portion fits into the body of the mirror) in the Interpart mirror was smaller than that in the Vitaloni mirror. Vitaloni's expert metallurgist Cox testified that this was due to plastic shrinkage as the plastic cooled down after being poured into the mold in a liquid state. Interpart's expert, Chivens, testified that plastic indeed shrinks as it cools but does so uniformly, so that the difference in cavity sizes could not be explained in this manner.

Experts Cox and Chivens testified that stamped metal portions at the rear of the Interpart mirrors could not have been produced by direct molding. Chivens concluded that none of the mirrors' parts were made in this way because of differences in tapering and the presence of parts on the Interpart mirrors not found on the Vitaloni mirrors. Cox testified that some of the Interpart mirrors had what appeared to be the reverse of some lettering found on the Vitaloni mirrors. And so the evidence went.

The only direct evidence on this issue was a report from Hiraoki (Taiwan), introduced into the record by Vitaloni and at

one time attached to Appellee's Answers to Appellant's Interrogatories, which were not filed. That report, Interpart claims, states that the direct molding process was not used. Both parties agree, however, that the report is "in large measure incomprehensible having apparently been translated from Chinese to Japanese to English." We are not moved by the existence of this document given that its content borders on being meaningless and that, if it is favorable to Interpart, Interpart, not Vitaloni, would have introduced the document at trial, or at the least, would have discussed it on appeal. It did neither.

The evidence leaves the issue of whether the direct molding process was used unresolved. Unless and until this is resolved at trial, Interpart cannot be found, as a matter of law, not to have violated California's statute. The case is remanded for a full trial on the issue of Interpart's alleged violation of § 17300 of the California Business and Professions Code.

### IV. Attorney Fees

■ The district court concluded that Vitaloni's patent infringement action against Interpart was an exceptional one and awarded attorney fees to Interpart under 35 U.S.C. § 285. We hold that there was adequate factual basis for the district court to exercise its discretion in this matter. The court justified its conclusion by noting

> [t]he failure of Vitaloni, S.p.A. or anyone acting on its behalf to bring the existence of the prior art Tornado mirror to the attention of the Patent Office Examiner and the subsequent filing of the patent infringement action....

Vitaloni not only admitted that it had sold Tornado mirrors more than one year before the application for the Tornado Van mirror design patent was filed, but the chairman of Torino Industries testified, during the TRO/preliminary injunction hearing seven months before Vitaloni's infringement action was filed, that Torino began selling the mirrors in June or July of 1978; the patent application was filed on 28 September 1979.

That being so, 35 U.S.C. § 102(b) stands as a bar to the grant of a patent if the design of the patent was the same as or obvious from what was sold. In addition, he testified that Imos Italia and Vitaloni had been selling the Tornado Mirrors in the United States for at least six years before the filing. Vitaloni failed to bring these acts to the Examiner's attention.

Vitaloni seeks to excuse itself by pointing out that the Tornado mirrors it had sold more than a year before filing did not include the Tornado Van mirror. We find no merit in this argument because the Tornado Van mirror is, without doubt, so similar that it was unreasonable and bad faith to withhold the sale information.

Vitaloni brought suit on the patent despite its knowledge of the sales. The district court was correct; this is an exceptional case under 35 U.S.C. § 285 and we uphold the award of attorney fees on the patent claim. See Hughes v. Novi American, 724 F.2d 122, 220 USPQ 707 (Fed.Cir. 1984); Stickle v. Heublein, 716 F.2d 1550, 1164, 219 U.S.P.Q. 377, 387 (Fed.Cir.1983).

### Conclusion

The district court's conclusion that federal law preempts California's plug molding statute is reversed, and the case is remanded for trial on the issue of whether Interpart's mirrors were made by the direct molding process as proscribed by California law. The district court's Order is otherwise affirmed.

AFFIRMED–IN–PART, REVERSED–IN–PART, AND REMANDED.