**BRAHMA, INC., a Texas corporation, Plaintiff,**

v.

**JOE YEARGAIN, INC., a California corporation, Cal Form, Inc., a California corporation, and Norman E. Ossman, Defendants.**

**No. C–86–20333–RPA.**

United States District Court, N.D. California.

June 25, 1987.

Randolf J. Rice, Angela M. Nolan, Pillsbury, Madison & Sutro, San Jose, Cal., for plaintiff.

Mark B. Fredkin, Morgan, Ruby, Teter, Schofield, Franich & Fredkin, San Jose, Cal., for defendants.

### AMENDED ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND PRELIMINARY INJUNCTION

AGUILAR, District Judge.

The Court has received, read, and considered all papers submitted on plaintiff Brahma, Inc.'s motion for summary judgment and preliminary injunction. In addition, the Court has heard and considered the argument of counsel. Good cause appearing therefor, the Court finds and orders as follows:

I. INTRODUCTION: Brahma, Inc. ("Brahma"), a manufacturer of camper shells for pick-up trucks, seeks damages and an injunction against Joe Yeargain, Inc. ("Yeargain") for violation of a California statute which prohibits the duplication of a competitor's product by means of the creation of a mold using the competitor's good as a pattern or "plug" for the mold. Such duplication by direct use of molding was found to be an unfair trade practice and proscribed by the California legislature. Brahma alleges that Yeargain engaged in such a practice when it created its "Stampede" camper shell which Yeargain manufactures and sells in direct competition with Brahma's shells. Because there are disputed issues of material fact and Brahma has not succeeded in making the required showing to obtain an injunction, the Court will deny both the motion for summary judgment and the motion for a preliminary injunction.

II. FACTS: Plaintiff Brahma is a Texas corporation engaged in the manufacturing and marketing of camper shells used on pick-up trucks. Brahma does a multimillion dollar business nation-wide and is particularly aggressive in marketing its camper shells in the western states.

Yeargain is a California corporation founded in 1980 by Mr. Joseph Yeargain. Mr. Yeargain no longer holds any stock in the corporation and is not involved in this litigation. From its creation until December 1984, Yeargain exclusively engaged in the business of finishing, assemblying, and selling (wholesale and retail) Brahma camper shells. Yeargain was one of five independently owned assembly facilities for Brahma camper shells on the West Coast.

Defendant Norman E. Ossmann was an employee of Brahma from 1979 to 1982. Ossmann was Brahma's Western Divisional Sales Manager responsible for the promotion and development of Brahma camper shells in eleven states. In July 1982, Ossmann left Brahma and bought stock in Yeargain. From 1982 to 1984, Ossmann worked for Yeargain as it continued to assemble and market Brahma camper tops. In 1983, a Jane Galvan bought into Yeargain. Today, Ossmann and Galvan are the sole stockholders in Yeargain, each holding fifty percent of the corporation's stock.

Ossmann testifies that in late 1984, Yeargain encountered contract problems when Brahma refused to extend Yeargain's contract for the period and on the terms sought by Ossmann. Brahma has no comment on those events, but both sides agree that in late 1984 Yeargain informed Brahma that it no longer intended to distribute Brahma's products. Ossmann alleges that he informed Brahma at that time that Yeargain intended to manufacture and market its own camper tops. Ossmann testifies that he showed two Brahma execu-

tives the prototype shell in late 1984 and, therefore, from that point forward Brahma was aware of the existence of Yeargain's "Stampede" camper shell.

These allegations are substantiated by the declaration of Jan Machen, former Vice President of Administration for Brahma. Machen states that as "the number two person in the corporation," he is aware of the perspective of Brahma during this period. Machen reports that Brahma actively monitored competitors' products and avers that a high level Brahma employee was shown Yeargain's Stampede camper shell late in 1984. Brahma executives discussed the similarity between the products and one can infer that Brahma felt it had a potential claim for unfair competition should it decide to sue Ossmann. Brahma's immediate and continuing concern, however, was not whether or not the Stampede shell was similar to Brahma's shells, "but whether Mr. Ossmann was going to interfere with the market Brahma wanted." Having dealt with Ossmann and Yeargain for several years, Brahma concluded that the competitive threat they presented was minimal. Brahma anticipated that Yeargain would go bankrupt fairly quickly.

The decision by Brahma to permit Ossmann and Yeargain to proceed without legal challenge was constantly reconsidered. According to Machen, the reevaluation always involved a cost-benefit analysis focusing on the cost of instituting a lawsuit versus the amount of business Brahma perceived it was losing to Yeargain's Stampede tops. Brahma believed that other camper top manufacturers also were improperly duplicating their designs. As to these other competitors, Brahma maintained the same "wait and see" attitude. In Machen's words, "No matter how similar the units might be, if they were poor marketers and thus considered by Brahma to be a feeble threat, then no legal action would be taken." In 1985, Yeargain sold over $2.2 million in camper shells, with some 75% of the revenues generated by the Stampede shell. In light of these figures, apparently Brahma decided Ossmann was becoming too successful and in May of 1986 they initiated this suit.

A. *The Legal Standard:* In order to put the remaining facts into context, it is necessary to refer to the statute invoked by Brahma in this suit. California Business and Professional Code § 17300 states as follows:

(a) It shall be unlawful for any person to duplicate for the purpose of sale any manufactured item made by another without the permission of that other person using the direct molding process described in subdivision (b) (sic—means subdivision (c)).

(b) It shall be unlawful for any person to sell an item duplicated in violation of subdivision (a).

(c) The direct molding processes subject to this section is (sic) any direct molding process in which the original manufactured item was itself used as a plug for the making of the mold which is used to manufacture the duplicate item.

(d) The provisions of this section shall apply only to items duplicated using a mold made on or after January 1, 1979.

Section 17301 provides that injunctive relief and damages are available to victims of violations of § 17300. The central question in this case is whether, within the meaning of the statute, Yeargain has used a Brahma camper top as a "plug" in a direct molding process which yielded a mold used in the manufacture of the Stampede camper top.

B. *The Stampede Camper Shell:* The facts surrounding the creation of the Stampede shell are surprisingly free from contention. Ossmann testifies that the Stampede was created in 14 weeks, from August to November 1984. By December 1984, the Stampede was on the market. Dan Grote, former Product Development Manager, Plant Manager, and Production Manager of Brahma was hired by Yeargain to be, in Ossmann's words, "the primary design force for the new camper shell." Only Ossmann, co-owner Galvan, Grote, a maintenance man named Mike, and Ossmann's son and daughter were involved in the creation process.

According to Ossmann's testimony, the process was as follows. To make the

"tool" or mold used to manufacture the Stampede shell, defendants began with a Brahma "hi-door mini" shell and used that shell "to establish the width, angles and length" of the Stampede shell. They then built a framework to support the Brahma shell from within, cut the back and front ends of it, and "then, using a polyurethane form, designed our camper shell over it." The crucial text of Ossmann's deposition continues:

Q. When you say that you designed your shell over the top of the center portion of the Brahma Hi-Door mini-size camper shell, how did you do that? Did you cause a moldable substance to cover the Brahma shell and make an impression of it?

A. Yes.

Q. And would you explain to me how that process was performed?

A. Polyurethane foam was spread over the top of this form and then carved to meet our specifications—to meet our design specifications.

Q. When you say "over the top of the form," are you talking about the wood form or the cut-up Brahma shell underneath?

A. It's a combination of both at this point, a combination wood form and what was left of the center section of the roof of the Brahma.

Thus, there is absolutely no dispute that Yeargain used a Brahma camper shell as part of the "plug" or pattern upon which polyurethane foam was applied to create the mold used to manufacture the Stampede shell. By Ossmann's own estimation, some 25% of the mold was the byproduct of the Brahma shell. Expert designer Grote estimates the figure to be from 25% to 30% of the mold surface. In other words, approximately 30 inches of the center portion of the Stampede top—running from the window level on one side of the shell to the window level on the other—was copied through the direct molding process from a Brahma top.

III. DISCUSSION: As presented, the facts call for a rather nimble exercise in statutory construction. Does § 17300 prohibit the type of conduct engaged in by Yeargain and does § 17301 prescribe the issuance of an injunction merely on the showing of a violation of of § 17300?

(A) *Case Law Interpreting § 17300:*

There is virtually no case law to guide this Court's interpretation of § 17300. Plaintiff has argued the case of *Metro Kane Imports, Ltd. v. Rowoco, Inc.*, 595 F.Supp. 702 (S.D.N.Y.1984), *vacated*, 760 F.2d 253 (2d Cir.1985), *on remand*, 618 F.Supp. 273 (S.D.N.Y.1985). *Metro* involved a suit by the maker of an orange juice squeezer against a competitor that had copied its product. Plaintiff sued under the Lanham Act, New York unfair competition law, and the anti-molding statutes of California (§ 17300), Tennessee, and Michigan.

Initially the district court in *Metro* found that although "[c]ertain pieces of the Rowoco juicer ... have not been produced from molds of the" Metro juicer, "the two products are ... identical in all observable respects." 595 F.Supp. at 704. In other words, the court found that the unrebutted evidence showed that the Metro product had been used as a plug and that although Rowoco added some non-plug-produced features, the finished product was *"identical in all observable respects." Id.* The court found that the plaintiff had not shown a likelihood of success on its Lanham Act or New York state claims, but had demonstrated probable success on the merits of the mold statutes. Nevertheless, the court denied a preliminary injunction because Metro failed to establish that irreparable harm would result should an injunction not be granted with respect to defendant's sales in the three mold statute states.

After the Second Circuit vacated the district court's ruling in an unpublished opinion, the district court reversed itself and issued an injunction. On remand, the district court found that plaintiff had stated a strong claim under New York law, and, rebalancing the equities, found that the balance of hardships favored the plaintiff and that no adequate remedy existed at law.

For purposes here, there are two important aspects of *Metro* on remand. First, in the interim between remand and the court's reconsideration, a Superior Court of California had granted an injunction based on its conclusion that the Rowoco juicer was made from a mold of the Metro juicer. There was no published opinion. The New York district court gave full faith and credit to that decision and found that the parties were bound by the injunction, at least in California. Thus, the district court formally did not consider the California claim when issuing the injunction.

The second important aspect of the court's decision on remand was that it again considered the equities, that is, violation of any of the unfair competition statutes did not per se grant plaintiff the right to an injunction. The court engaged in the traditional task of balancing probability of success and the relative hardships of the parties.

Thus, the district court in *Metro* did not provide any guidance on the proper interpretation of § 17300. The court's first opinion was vacated and its second opinion explicitly excluded consideration of the California claim in light of an existing injunction issued by a California superior court. Plaintiffs have grossly overstated the *Metro* opinion when they suggest that it is "directly on point with the present case." While the facts may have been roughly similar, there was literally no legal holding in the case with respect to the California molding statute claim. Even if this Court was to give any weight to an interpretation of California law rendered by a New York federal district court, *Metro* says nothing.

The sole case that sheds any light on § 17300 is *Interpart Corp. v. Italia*, 777 F.2d 678 (Fed.Cir.1985). The case involved claims of patent and Lanham Act infringement in connection with the manufacture and sale of automobile rear view mirrors. Judge Pfaelzer of the Central District of California had granted summary judgment to Interpart on a claim of violation of § 17300. The district court found that the statute was preempted by federal patent law and that the facts clearly showed no violation of the statute even if it withstood preemption.

The Federal Circuit reversed on both counts. The court found that the California law did not "clash" with federal patent law, that the patent laws and § 17300 had different objectives, and that absent any conflict, contradiction, or impediment to the achievement of congressional objectives, the California anti-molding statute was a valid law. Further, although the circuit court agreed that "the statute does not prohibit a process that employs an intermediate step which may or may not include the use of an impression ... between the original article and the mold directly used to manufacture copies of the original," 777 F.2d at 685, there was a genuine issue of material fact as to how Interpart made its mirrors.

In reaching its legal conclusions, the circuit necessarily passed on the content of the California statute. The court stated:

> The California plug molding statute ... proscribes use of the product itself for a pattern or "plug" in a direct molding process. In that process, the product is entirely coated with a mold-forming substance that sets and which is then removed from the product and used as the mold for making numerous replicas of the product. This process is substantially less expensive than developing a mold from scratch, something the original product manufacturer has to do.

777 F.2d at 684.

This description of the statute is the only precedent available to guide this Court's interpretation of § 17300.

**(B)** *The Legislative History of § 17300:*

The legislative history of the § 17300 provides little assistance to the interpretation problem in this case. The bill was sponsored by a manufacturer of fiberglass spas. According to the sponsor, a fiberglass manufacturer may spend anywhere between $20,000 and $40,000 in the creation of a mold for a new product. The expense is necessary because of the craftwork needed in forming the mold. Once the mold is completed and the new product is on the market, unscrupulous competitors were able to purchase the finished product and

use it as a form for casting their mold. In a short period of time, a competitor could be marketing the same product without the high original investment expense. The bill was designed to prevent such pirating of design work, but only when a direct molding process is used. There was no recorded debate on the bill (S.B. No. 2177) and it was passed unanimously in both houses of the legislature. The bill became law on October 1, 1978, without the Governor's signature, and went into effect January 1, 1979.

The analysis of the Legislative Counsel of California sheds little light on the application of the law to Yeargain's actions. The counsel's analysis does state that the proposed law would apply "to all industries," not just fiberglass. The analyst also gives the following example of what the law prohibits:

> One example [of prohibited molding] would be where a boat hull is covered with a mold making material such as fiberglass ..., that material is allowed to harden, is removed from the original boat and is then used as a form to manufacture new boats.

Taking together the legislative analyst's statements, the meager legislative history of the bill, and the text of the law itself, the clear intent of the law is to prohibit what the legislature considered to be an unfair trade practice. The law was aimed at competitors who used a direct molding process to avoid significant design costs associated with developing a mold for a product. The focus of the inquiry in this case should not be on the fact that the mold was only partially made using a Brahma shell as a plug, but rather *on whether by using the Brahma shell to create its mold Yeargain obtained an unfair competitive advantage by avoiding otherwise necessary development costs.*

### (C) *The Debate Over Material Facts:*

Given the facts as presented by the parties, the Court at this time cannot make a clear legal determination whether § 17300 has been violated. The facts relating to theoretical design time and cost requirements, costs experienced in this case, and the relative advantage acquired are hotly disputed.

Brahma offers evidence that the Stampede was made without engineering drawings. Defendants' own witness, Mr. Grote, a supposed expert in the area, stated that he had never heard of a camper top being built without engineering drawings—drawings which cost on average $3,000 to $5,000. The same Mr. Grote declared for defendants, in contradiction of his earlier deposition, that building a mold without drawings is common.

Grote also states that Yeargain's use of the Brahma shell saved only 2–3 days of work and $400–$600 in expenses. Even with these savings, Ossmann declares that Yeargain spent over $40,000 to design and construct the initial Stampede mini and maxi hi-door camper shells. Overall, Ossmann states that Yeargain has spent "in the neighborhood of $70,000 to $100,000" to develop the Stampede.

In opposition to these statements, Brahma President Don Law declares that Yeargain saved thousands by using the Brahma shell. Law states that Brahma has invested hundreds of thousands of dollars in developing, researching, and marketing Brahma tops. He also asserts that:

> In terms of engineering costs alone, Brahma expends approximately $50,000 to design, tool, and produce a mold for a particular top. If a previously designed top is used to produce a mold for a substantial portion of a new top (as is the case with the Stampede produce), approximately 80% of the foregoing costs are avoided.

Brahma offers the declaration of their engineer Dwayne Ford to show that a substantial portion of the Stampede top is the byproduct of a mold of a Brahma shell. Ford contends that 83% of the surface area of a Stampede top is "a direct duplication of the corresponding areas of a Brahma top." Ford states that such duplication is only possible through direct molding or "splashing" (the technical term). On the basis of his findings, Ford estimates that Yeargain saved 83% of the development costs and a minimum of 10 months of de-

velopment time by using a Brahma top as a plug for the Stampede mold.

As one could have predicted, Yeargain is not about to be outdone by Brahma's expert. To begin with, Yeargain wages an all-out assault on Ford's methods and conclusions, not to mention his credibility. On cross-examination, Ford did begin to reduce his figure and his testimony potentially raises some doubts about his estimates. Moreover, Yeargain offers the declaration of Pam Vernon, an architect specializing in design. Her conclusion is that "[g]iven the obvious and substantial differences in the design characteristics of these two products, the same mold could not create both of these products."

■ The Court finds that the crucial evidence is Ossmann's testimony in which he admits to having used the Brahma top as a plug and describes how that was done. His testimony and that of Grote establishes a prima facie case of a violation of § 17300. However, defendants have offered enough evidence to avoid summary judgment. Whether the statute was violated is an issue for the trier of fact. Summary judgment must be denied.

(D) *Preliminary Injunction Under § 17301:*

■ Despite losing its motion for summary judgment, Brahma could still secure a preliminary injunction if it could demonstrate a likelihood of success on the merits and "a significant threat" of irreparable harm. *Sierra On-Line, Inc. v. Phoenix Software,* 739 F.2d 1415, 1421 (9th Cir. 1984). Alternatively, Brahma could garner an injunction by demonstrating facts tending to establish a "fair chance of success on the merits" and that the balance of hardships tips sharply in its favor. *Id.* Brahma has established solid grounds for its case and has at least a fair chance of success on the merits. However, Brahma has not and apparently cannot show irreparable harm or great injury. Brahma has not offered probative evidence supporting its claim of injury. The facts show that Brahma waited nearly two years before filing this lawsuit; irreparable harm would have prompted action sooner. Further, Yeargain asserts that there are many competitors in the camper shell market and that Yeargain's presence or absence would not have a significant impact on the fortunes of Brahma. In contrast, some 75% of Yeargain's income is generated by sales of Stampede tops. Yeargain reportedly lost $26,000 last year. To enjoin the sale of Stampede tops arguably would destroy the company. In the balance of hardships, Yeargain clearly is the more vulnerable party and that reason alone is enough to deny the motion for an injunction.

Brahma mistakenly argues that § 17301 requires the court to issue an injunction once a violation of § 17300 is established. Brahma tries to argue that here, as in copyright infringement actions, a showing of a reasonable likelihood of success on the merits raises a presumption of irreparable harm. *Cf. Apple Computer v. Formula Intern'l Inc.,* 725 F.2d 521 (9th Cir.1984). The law does not state such a proposition nor is there any reason to imply one. Section 17301 merely provides that recovery for violation of § 17300 is not limited to damages, but that in its discretion a court may do equity. Of course, a critical factor considered by a court in equity is the adequacy of the remedies at law. In this case, there is no reason to believe that damages will be inadequate. This is another reason to deny the motion for a preliminary injunction.

IV. CONCLUSION:

Although plaintiff has established a prima facie case of a violation of California Business and Professional Code § 17300, defendants have offered sufficient evidence to partially rebut plaintiff's showing and raise several issues of material fact.

The Court finds that the statute in question was written to prohibit manufacturers from unfairly competing by using a competitors product as a "plug" or pattern in making a mold which in turn is used to manufacture the same product. In the context of the present case, the critical inquiry relative to the violation of § 17300 is whether by using the Brahma shell to create its mold, Yeargain obtained an unfair competitive advantage by avoiding otherwise necessary development costs.

**1454**

The Court finds that there are disputed issues of material fact relative to the just mentioned inquiry which are properly within the domain of the trier of fact.

GOOD CAUSE APPEARING THEREFOR, PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IS HEREBY DENIED.

Furthermore, the Court finds that the plaintiff has not demonstrated that it will suffer irreparable harm should an injunction be denied, nor has plaintiff demonstrated that the balance of hardships in this case tips decidedly in its favor.

GOOD CAUSE APPEARING THEREFOR, PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION IS HEREBY DENIED.

IT IS SO ORDERED.