Ilan GOLAN (doing business as Golan Products), Plaintiff–Appellant,

v.

PINGEL ENTERPRISE, INC., Wayne Pingel, Donna M. Pingel, and Arlen Ness, Defendants–Appellees.

No. 01–1626.

United States Court of Appeals, Federal Circuit.

Nov. 7, 2002.

Jon E. Hokanson, Small Larkin, LLP, of Los Angeles, California, argued for plaintiff-appellant. With him on the brief was J. Thomas Gilbride, of Whittier, California.

Kenneth B. Axe, Lathrop & Clark LLP, of Madison, Wisconsin, argued for defendants-appellees. With him on the brief was Donald L. Heaney.

Before NEWMAN, GAJARSA, and PROST, Circuit Judges.

GAJARSA, Circuit Judge.

The plaintiff-appellant, Ilan Golan ("Golan"), seeks review of the final judgment of the United States District Court for the Central District of California granting summary judgment to the defendants-appellees, Pingel Enterprise, Inc., Wayne

and Donna Pingel, and Arlen Ness (together "Pingel"), on Golan's federal and state antitrust and unfair competition claims, and state tort claims. The district court determined that none of Golan's claims could survive Pingel's motion for summary judgment because Pingel made no actionable false or misleading statements. We affirm the grant of summary judgment dismissing the federal and state antitrust claims because Golan failed to show Pingel possessed monopoly power in the relevant market. We also affirm the grant of summary judgment dismissing the federal and state unfair competition claims and state tort claims because Golan has not presented clear and convincing evidence sufficient for a reasonable jury to conclude Pingel acted in bad faith. Finally, because the district court applied the wrong law to the statements relating to trademark infringement, we reverse and remand for proceedings consistent with our opinion herein.

## I. BACKGROUND

Pingel manufactures after-market motorcycle fuel valves, also called "petcocks," for Harley–Davidson motorcycles. Petcocks regulate the flow of fuel between the fuel tanks and the engine. Pingel sells its petcocks under the unregistered trademark "Power–Flo," and owns utility and design patents relating to motorcycle fuel valves.

Golan also manufactures after-market products for Harley–Davidson motorcycles. Golan's product line includes a fuel filter, and a fuel valve. Golan markets both the filter and the valve under the trademark "Peak Flow." Through distributors, Golan advertised the Peak Flow filter as early as 1997. The Peak Flow fuel valve became available sometime in 1998. The record contains evidence that Golan showed a prototype of the Peak Flow fuel valve at a trade show in February 1998, but both Golan and Pingel represented to the district court that Golan's first sale of the Peak Flow valve was in October, 1998.

In 1997, one distributor, Rivera Engineering ("Rivera"), issued a promotional brochure advertising Golan's Peak Flow filter. Pingel received this brochure, which advertised that the Peak Flow filter was "flow rated @ 6.3 gallons per minute," and requested a sample Peak Flow filter from Golan. Golan provided the sample. Wayne Pingel testified that he tested the Peak Flow filter and found that it failed to exhibit the advertised flow rate. Pingel then faxed a handwritten note to Rivera, on September 24, 1997. This facsimile, addressed to "Distributor," indicated that Wayne Pingel had tested the filter, and stated:

> I don't recommend these filters with my or stock HD valves. Don't be mislead [sic], they will *not* flow 6 gal. per minute on *any* gravity system.

The district court found that in response, "Rivera apparently ignored Pingel's warning and continued to carry the fuel filter."

In late 1998, Pingel became aware that Golan was selling the Peak Flow fuel valve. Pingel obtained a sample of the valve, and consulted his then-patent attorney. The district court found that "[i]n consultation with his long-time patent attorney, ... Pingel determined that [Golan's] valve infringed a [Pingel] utility patent, a [Pingel] design patent, and [Pingel's] 'Power–Flo' trademark for petcock valves."

Through his patent attorney, Pingel sent a cease-and-desist letter to Golan. The letter, dated October 30, 1998, accused Golan of infringing United States Patent No.

4,250,921 ("the '921 patent"), United States Patent No. Des. 363,533 ("the '533 design patent"), and Pingel's Power–Flo mark for petcocks. The letter demanded that Golan "immediately cease and desist *all* manufacturing and *all* sales of [Golan's] petcock." The letter also warned that failure to terminate manufacturing and selling of the valves "will result in legal action for patent and trademark infringement." Wayne Pingel testified that at the time this letter was sent, Pingel was contemplating a lawsuit against Golan.

On November 2, 1998, several days after sending the cease-and-desist letter to Golan, Pingel sent a letter to each of its twenty-two distributors. This letter stated:

> The purpose of this letter is to alert our distributors that a petcock manufactured and distributed by Golan Products, [sic] infringes patents and a trademark held by Pingel Enterprise, Inc. We are taking immediate action to halt the production and sale of this product.

> If you are approached to distribute a petcock for Golan Products, or if you have any questions or comments, please call me. . . .

Pingel's letter to the distributors failed to specify which patents and trademark Golan's fuel valve allegedly infringed. Golan presented evidence that subsequent to receiving this letter, one distributor, Custom Chrome, cancelled a purchase order for Golan's valves that had already been filled and paid for.

The record contains evidence that just before February, 1999, Wayne Pingel called Mel Magnet, President of Rivera. Mr. Pingel allegedly opened this conversation by asking, "[i]sn't one fuel valve enough," and stating that Golan's valve infringed Pingel's valve, and that it would be "a pleasure to take you down." On February 5, 1999, Pingel, through its attorney, sent a letter to Mel Magnet of Rivera demanding that Rivera cease and desist all sales of Golan's Power–Flow petcock. Pingel's attorney also sent a letter requesting that Golan's attorney agree to accept service of a summons and complaint for infringement on Golan's behalf.

During his deposition, Pingel's attorney, White, admitted that when he sent this letter, Pingel had not authorized him to file an infringement suit. Additionally, Pingel testified that he had not authorized White to initiate litigation against Golan and that he had no intention of suing Rivera when he sent Rivera the letter demanding that Rivera cease and desist selling Golan's valve.

After sending these letters, Pingel contacted at least two additional outside attorneys in order to assess the likelihood of prevailing on the merits of its infringement claims. Both outside attorneys told Pingel the litigation would be expensive and that the issues were "close." The first outside attorney issued one opinion orally. The second outside attorney sent Pingel a letter on March 31, 1999, stating that "whether Pingel would prevail on any of [its potential] claims is a close issue." The letter also informed Pingel, albeit incorrectly, that "[t]he '921 patent expires April 23, 1999, which is 20 years from after the filing of its application." [1] The letter also advised Pingel "to engage an independent

---

1. Effective June 8, 1995, the patent laws were amended to change the term of a patent from seventeen years measured from the date the patent issued to twenty years measured from the filing date of the earliest U.S. application for which priority benefit is claimed. Appli-

intellectual property attorney to formally evaluate these claims and offer an opinion as to whether there is infringement." Pingel did not initiate patent or trademark infringement litigation against Golan.

In March, 1999, less than five months after Pingel's cease-and-desist letter, Golan initiated the present action. Golan sought declaratory judgment of noninfringement for the "Power–Flo" trademark and for several patents owned by Pingel, including the two patents referenced in the cease-and-desist letter. Golan also alleged federal and state antitrust claims, federal and state unfair competition claims, and state law business tort claims.

Pingel filed an answer and counterclaims. Pingel's answer alleged that the district court lacked subject matter jurisdiction due to the absence of a case or controversy regarding the patents other than the '533 design patent and the '921 patent. Pingel's counterclaims included trademark and unfair competition claims pertaining to the Power–Flo mark, and infringement of the '533 design patent. Although Pingel did not counterclaim for infringement of the '921 patent, neither did it represent that the court lacked jurisdiction for want of a case or controversy regarding that patent. Rather, Pingel admitted that the '921 patent expired on May 10, 1998, but stated that the defendants lacked knowledge regarding when Golan's Peak Flow petcock was first offered for sale.

Golan moved for partial summary judgment of noninfringement of the '533 design

patent and of the '921 patent. Golan filed its motion regarding the '921 patent on August 27, 1999. Pingel filed an opposition to Golan's motion for summary judgment of noninfringement of the '921 patent on October 4, 1999. The opposition stated, for the first time, that there was no case or controversy because the '921 patent had expired, that Golan testified he first sold the Peak Flow petcock after the expiration of the patent, and that Pingel had asserted no claim of past or present infringement. The opposition acknowledged that the October 10, 1998 cease-and-desist letter from Pingel's counsel to Golan was sent after the patent expired. In addition to its opposition, Pingel also filed a statement of nonliability, in which Pingel covenanted not to sue Golan or any of its customers for infringement of the '921 patent.

The district court granted Golan's motion for summary judgment of noninfringement of the '533 design patent. *Golan v. Pingel Enter., Inc.*, No. CV 99–3143 (C.D.Ca. Nov. 4, 1999) (memorandum of decision granting partial summary judgment). The court dismissed Golan's claim for declaratory judgment of noninfringement of the '921 patent as moot. *Golan v. Pingel Enter., Inc.*, No. CV 99–3143 (C.D.Cal. Nov. 4, 1999) (order dismissing motion as moot).

■ Pingel then moved for summary judgment on Golan's tort, unfair competition, and antitrust claims. The district court found that these claims rested entirely on one or both of two activities:

cations that were filed on or after June 8, 1995 have a twenty year term measured from the date of filing. All patents that were in force on June 8, 1995, or that issued on an application that was filed before June 8, 1995, have a term that is the greater of the twenty year term or seventeen years from the patent

grant. 35 U.S.C. § 154(c)(1) (2000). The '921 patent was filed on April 23, 1979, claimed priority to a divisional application filed on May 10, 1978, and issued on February 17, 1981. Thus, the '921 patent expired on May 10, 1998, not April 23, 1999 as Pingel's attorney incorrectly advised.

Pingel's communications with Rivera regarding the flow rate of Golan's filter, and Pingel's communications with Golan and Pingel's distributors regarding Golan's alleged patent and trademark infringement. The district court held that neither activity is actionable. Pingel's facsimile communication with Rivera, it determined, was not actionable because Golan provided no evidence to show that the assertion contained in the facsimile that Golan's filter failed to flow at the advertised 6.3 gallons per minute in a gravity system was untrue.[2] Pingel's communications regarding Golan's alleged infringement, the district court determined, were not actionable because Golan provided insufficient evidence to rebut the presumption that Pingel made the claims in good faith. Consequently, the court granted summary judgment on Golan's tort, unfair competition, and antitrust claims.[3]

Golan appeals, contending that issues of material fact preclude summary judgment on his tort, unfair competition, and antitrust claims.

## II. JURISDICTION

■ Although Pingel's counterclaims requested direct coercive relief under the patent laws, in *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 122 S.Ct. 1889, 1893, 153 L.Ed.2d 13 (2002), the Supreme Court held that § 1295(a)(1) authorizes us to exercise appellate jurisdiction over only those appeals in which the complaint authorized the district court to exercise jurisdiction pursuant to 28 U.S.C. § 1338. After *Vornado*, we may no longer rely solely on counterclaims arising under the patent laws to establish our appellate jurisdiction.

■ Nevertheless, we have jurisdiction over this appeal because Golan's well-pleaded complaint sought declarations of patent noninfringement. Consequently, the complaint arose, in part, under 28 U.S.C. § 1338. This is so because, as the Supreme Court directed in *Vornado*, the well-pleaded complaint rule governs district court patent jurisdiction under § 1338 to the same extent that it governs the existence of general federal question jurisdiction under § 1331. *Id.* at ——, 122 S.Ct. at 1893 (" '[l]inguistic consistency' requires us to apply the same test to determine whether a case arises under § 1338(a) as under § 1331.") (quoting *Christianson v. Colt Indus. Operating*

**2.** In making this determination, the district court excluded portions of Golan's declaration as hearsay and for lack of foundation, and excluded Exhibit B to Golan's declaration on these grounds as well as failure to produce previously the document in discovery.

**3.** The district court declined to grant Pingel's motion for summary judgment regarding the trademark claim but, subsequently, the parties stipulated to dismissal without prejudice of Pingel's trademark counterclaims and of Golan's claim for declaratory judgment of noninfringement of Pingel's trademark. The district court ultimately ordered the trademark claims dismissed without prejudice. Although the district court did not provide a Rule 54(b) certification or other entry of final judgment, this case appears to satisfy the final judgment rule. This court applies the law of the pertinent regional circuit, here the Ninth Circuit, to determine whether the district court's entry was final relative to all pending issues. *See CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1314–15, 55 USPQ2d 1804, 1808 (Fed.Cir.2000). The Ninth Circuit recently issued an opinion that expressly approved of the exercise of jurisdiction "in a situation indistinguishable from ours," in which the Sixth Circuit held "that appellate jurisdiction exists where plaintiff, with the district court's permission, dismissed without prejudice the remaining claims in order to make the judgment appealable." *James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1069 (9th Cir.2002) (citing *Hicks v. NLO, Inc.*, 825 F.2d 118, 120 (6th Cir.1987)).

*Corp.,* 486 U.S. 800, 808, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)); *see also Christianson,* 486 U.S. at 809, 108 S.Ct. 2166 (holding that jurisdiction exists under § 1338 only in those cases in which a "well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims").

In the context of declaratory judgments under § 1331, the plaintiff's complaint arises under federal law if the cause of action that the declaratory defendant threatens to assert arises (or would arise) under federal law. *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.,* 463 U.S. 1, 18, 103 S.Ct. 2841, 2850–51, 77 L.Ed.2d 420 (1983) (noting that under the doctrine of *Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), which interpreted the federal declaratory judgment act so as not to confer jurisdiction over cases that otherwise would not arise under federal law, federal courts regularly exercise jurisdiction over suits in which "if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question"). In the context of a complaint seeking a declaration of noninfringement, the action threatened by the declaratory defendant, here Pingel, would be an action for patent infringement. Such an action clearly arises under the patent laws. *See, e.g., Pixton v. B & B Plastics, Inc.,* 291 F.3d 1324, 1327, 62 USPQ2d 1944, 1946 (Fed.Cir. 2002) (vacating dismissal and holding that district court had jurisdiction because patent infringement suit arises under the patent laws); *see also Franchise Tax Bd.,*

463 U.S. at 18 n. 19, 103 S.Ct. 2841 (recognizing that "federal courts have consistently adjudicated suits by alleged patent infringers to declare a patent invalid, on the theory that an infringement suit by the declaratory judgment defendant would raise a federal question over which the federal courts have exclusive jurisdiction") (citing *E. Edelmann & Co. v. Triple–A Specialty Co.,* 88 F.2d 852 (7th Cir.1937)). Thus, after *Vornado,* that Pingel actually counterclaimed for patent infringement is irrelevant to our jurisdiction. Instead, it is Golan's well-pleaded complaint, which sought, among other things, declarations of patent noninfringement, that controls, regardless of whether or not Pingel counterclaimed for patent infringement in response to Golan's complaint. Consequently, this court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(1).

## III. STANDARD OF REVIEW

This court reviews the grant of summary judgment *de novo,* reapplying the summary judgment standard to determine whether it was appropriately granted. *Pickholtz v. Rainbow Techs., Inc.,* 284 F.3d 1365, 1371, 62 USPQ2d 1340, 1343 (Fed.Cir.2002); *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.,* 984 F.2d 1182, 1185, 25 USPQ2d 1561, 1563 (Fed.Cir. 1993). Summary judgment is appropriate when there are no issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Evidence, and any inferences to be drawn therefrom, must be viewed in the light most favorable to the non-movant. *Id.* at 255, 106 S.Ct. 2505. Where the party opposing summary judgment bears

the burden of proof at trial, however, it must show more than a mere metaphysical doubt regarding the material facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Nor will the existence of a mere scintilla of evidence suffice. *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505. Rather, the non-movant must show the existence of a genuine issue of material fact, which exists only if the evidence is such that a reasonable jury could reach a verdict in its favor. *Id.*

■ "As a general proposition, when reviewing a district court's judgment involving federal antitrust law, we are guided by the law of the regional circuit in which that district court sits. . . ." *In re Indep. Serv. Orgs. Antitrust Litig.,* 203 F.3d 1322, 1325, 53 USPQ2d 1852, 1854 (Fed.Cir.2000). The same is true of this court's review of Lanham Act claims. *Cont'l Plastic Containers v. Owens Brockway Plastic Prods., Inc.,* 141 F.3d 1073, 1080, 46 USPQ2d 1277, 1282 (Fed.Cir.1998). In this case, the pertinent law is that of the Ninth Circuit.

■ In contrast, Federal Circuit law applies to causes of action within the exclusive jurisdiction of the Federal Circuit. *United States v. Hohri,* 482 U.S. 64, 75, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987) (holding Congress' desire to create national uniformity requires that the Federal Circuit decide questions arising under the federal Constitution and statutes whenever such questions arise in cases within the Federal Circuit's jurisdiction); *Midwest Indus., Inc., v. Karavan Trailers, Inc.,* 175 F.3d 1356, 1358–59, 50 USPQ2d 1672, 1674–75 (Fed.Cir.1999) (*en banc*) (overruling *Cable Elec. Prods., Inc. v. Genmark, Inc.,* 770 F.2d 1015, 226 USPQ 881 (Fed.Cir.1985)); *Interpart Corp. v. Italia,* 777 F.2d 678, 228 USPQ 124 (Fed.Cir.1985).

## IV. DISCUSSION

On appeal, Golan contends that disputed issues of material fact require this court to reverse the district court's grant of summary judgment dismissing each of Golan's claims. In particular, Golan points to evidence in the record indicating that Pingel made false or misleading statements regarding the performance characteristics of the Peak Flow valve, and regarding infringement of Pingel's patents and trademark, and that Pingel made these statements in bad faith. Pingel contends that this court should affirm the grant of summary judgment on all claims because the record contains no evidence that its statement regarding the flow rate of Golan's valve was untrue, or that it alleged infringement in bad faith. In the alternative, Pingel contends that this court should affirm the grant of summary judgment because the record is devoid of evidence creating a genuine issue of material fact regarding other elements of each of the asserted claims.

### A. *Federal and State Antitrust Claims*

We affirm the district court's grant of summary judgment dismissing Golan's state and federal antitrust claims on alternate grounds. These claims cannot proceed because Golan failed to provide evidence that Pingel possessed monopoly power in the relevant market.

■ Under § 2 of the Sherman Act, "[t]he offense of monopoly . . . has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell*

*Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). "[D]efining the relevant market is indispensable to a monopolization claim" under § 2 of the Sherman Act. *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir.1989). The relevant market has two dimensions, the relevant product market which includes a determination of the lack or presence of readily available substitutes and the relevant geographic market when the competition is geographically confined. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *Kodak v. Image Technical Servs.*, 504 U.S. 451, 481–82, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (stating that the relevant market is determined by choices available to purchasers and is composed of products with reasonable interchangeability) (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)); *see also Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1353, 52 USPQ2d 1641, 1645 (Fed.Cir. 1999). California's state antitrust statute, the Cartwright Act, is patterned after the Sherman Act, and Sherman Act decisions are applicable to cases under the Cartwright Act. *See* Cal. Bus. & Prof.Code § 16700, et seq.; *G.H.I.I. v. MTS, Inc.*, 147 Cal.App.3d 256, 195 Cal.Rptr. 211, 216 (1983).

Golan's antitrust claims cannot survive summary judgment because Golan failed to satisfy the summary judgment requirement of proffering sufficient evidentiary support to establish, *prima facie,* the possession of monopoly power in the relevant market.

■ Indeed, Golan's antitrust claims fail for at least two reasons. First, Golan failed to provide sufficient evidence to establish a relevant market. Golan offered only conclusory allegations that the relevant market is the "high end after-market motorcycle fuel valve market for Harley Davidson motorcycles" without further supporting evidence. Pingel presented uncontroverted evidence that its fuel valves compete against lower priced valves that are interchangeable substitutes, and that it lacked monopoly power and could not control prices. Golan presented no expert testimony regarding monopolization or the relevant market, nor did Golan present evidence sufficient to raise a question of material fact regarding the existence or nonexistence of interchangeable substitutes. Although Golan presented declarations of dealers in the motorcycle fuel valve industry stating that Golan and Pingel's valves are the only products in the "high end high performance aftermarket motorcycle fuel valve market for Harley Davidson motorcycles," these conclusory statements are insufficient to exclude lower priced interchangeable substitutes from the relevant market. "High end," and "high performance" are irrelevant if "lower end," and "lower performance" valves are interchangeable substitutes. Pingel's testimony regarding interchangeability is therefore uncontroverted.

Second, even assuming the relevant market is as narrow as Golan suggests, Golan failed to prove that Pingel had acquired monopoly power in this relevant market. Golan offered no evidence of market share, barriers to entry, or any other commonly accepted evidence showing monopoly power. From the record before us, the evidence at best shows there were two competitors in this limited market. Without proof of monopoly power Golan's antitrust claims must fail.

We therefore affirm the dismissal of Golan's antitrust claims because Golan failed

to satisfy the summary judgment requirement of proffering sufficient evidentiary support to establish, *prima facie,* the possession of monopoly power in the relevant market.

### B. *Federal and State Unfair Competition Claims & State Tort Claims*

With regard to the remaining claims, we affirm the district court's grant of summary judgment in Pingel's favor. The district court analyzed the challenged statements under the following two categories: 1) Pingel's communications with Rivera regarding Golan's fuel filter; and 2) Pingel's allegations of patent and trademark infringement.

#### 1. Pingel's communications with Rivera regarding Golan's fuel filter

We agree with the district court that Pingel's facsimile statement to Rivera regarding the flow rate of the Peak Flow filter was not itself actionable. This statement represented that Pingel tested the filters and that they would not flow at the advertised six gallon per minute rate in a gravity system. Wayne Pingel testified that he tested Golan's filter and it failed to flow at the advertised 6.3 gallons per minute rate. Golan's argument that this statement is false rests on the contention that "it is entirely possible that a reasonable jury could find that [Pingel] had made false or misleading descriptions of the *filter element* found in the [Golan] fuel filter...." Applnt's Br. at 56 (emphasis added). We disagree. The facsimile plainly refers to the flow rate of the fuel filter in a gravity system, not to any limit-

ed element thereof. Because Golan's argument rests on a strained and implausible reading of the challenged statement, we agree with the district court that Golan failed to present evidence sufficient to raise a genuine issue of material fact that this statement was false or misleading.[4]

#### 2. Pingel's allegations of infringement

The district court considered the allegations of patent infringement and trademark infringement as a single issue. For the reasons discussed below, we address the allegations separately.

##### a. Patent infringement allegations

In general, "federal patent law bars the imposition of liability [under federal or state law] for publicizing a patent in the marketplace unless the plaintiff can show that the patent holder acted in bad faith." *Zenith Elecs. Corp. v. Exzec, Inc.,* 182 F.3d 1340, 1353, 51 USPQ2d 1337, 1347 (Fed.Cir.1999) (quoting *Hunter Douglas, Inc. v. Harmonic Design, Inc.,* 153 F.3d 1318, 1336, 47 USPQ2d 1769, 1782 (Fed.Cir.1998). "[A] patent owner has the right to ... enforce its patent, and that includes threatening alleged infringers with suit." *Concrete Unlimited, Inc. v. Cementcraft, Inc.,* 776 F.2d 1537, 1538, 227 USPQ 784, 785 (Fed.Cir.1985).

In *Mikohn Gaming Corp. v. Acres Gaming, Inc.,* this court articulated a federal standard applicable to all torts, state or federal, based on a patentee's statements about patent infringement to a potential infringer and the industry. 165 F.3d 891, 897, 49 USPQ2d 1308, 1312 (Fed.Cir.1998). We explained that

dence regarding the flow rate of the filter element itself.

---

**4.** This determination renders harmless any abuse of discretion the district court might have committed in excluding Golan's evi-

communication to possible infringers concerning patent rights is not improper if the patent holder has a good faith belief in the accuracy of the communication. Although "bad faith" may encompass subjective as well as objective considerations, and the patent holder's notice is not irrelevant to a determination of bad faith, a competitive commercial purpose is not of itself improper, and bad faith is not supported when the information is objectively accurate. In general, a threshold showing of incorrectness or falsity, or disregard for either, is required in order to find bad faith in the communication of information about the existence or pendency of patent rights. Indeed, a patentee, acting in good faith on its belief as to the nature and scope of its rights, is fully permitted to press those rights even though he may misconceive what those rights are.

*Id.* Moreover, in *C.R. Bard Inc. v. M3 Sys., Inc.,* we explained that:

> The law recognizes a presumption that the assertion of a duly granted patent is made in good faith, *see Virtue v. Creamery Package Mfg. Co.,* 227 U.S. 8, 37–38, 33 S.Ct. 202, 57 L.Ed. 393 (1913); this presumption is overcome only by affirmative evidence of bad faith.

*C.R. Bard,* 157 F.3d 1340, 1369, 48 USPQ2d 1225, 1246 (Fed.Cir.1998).

■ Consequently, patentees do not violate the rules of fair competition by making accurate representations, and are allowed to make representations that turn out to be inaccurate provided they make them in good faith. *See Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 710, 24 USPQ2d 1173, 1180–81 (Fed.Cir.1992). Nevertheless, if the party challenging such statements under state or federal law presents clear and convincing evidence that the infringement allegations are objectively false, and that the patentee made them in bad faith, *viz.,* with knowledge of their incorrectness or falsity, or disregard for either, the statements are actionable and are not protected by the existence of a patent. To survive summary judgment, the party challenging such statements must present affirmative evidence sufficient for a reasonable jury to conclude that the patentee acted in bad faith, in light of the burden of clear and convincing evidence that will adhere at trial.

In *Zenith Electronics,* we explained that the law regarding proof of bad faith is case-specific. In certain cases, bad faith may be clear:

> Exactly what constitutes bad faith remains to be determined on a case by case basis. Obviously, if the patentee knows that the patent is invalid, unenforceable, or not infringed, yet represents to the marketplace that a competitor is infringing the patent, a clear case of bad faith representation is made out.

182 F.3d at 1354, 51 USPQ2d at 1348.

■ To show bad faith in Pingel's actions, Golan must offer clear and convincing evidence that Pingel had no reasonable basis to believe that the GP petcock infringed Pingel's patents or that Pingel knew it was enforcing an expired, and therefore unenforceable, patent. In this case, there is not clear and convincing evidence from which a reasonable jury could conclude that Pingel alleged patent infringement in bad faith or knowingly enforced an expired patent. Our review of the record reveals two separate categories of conduct which Golan asserts, either explicitly or implicitly, shows Pingel's bad

faith: (1) notification of infringers without intention of initiating suit; and (2) enforcing an expired patent.

First, Golan points to Pingel's intent not to initiate suit as evidence of bad faith. Wayne Pingel admitted during his deposition that, at the time Pingel notified Rivera of Golan's potential infringement, Pingel did not intend to initiate suit against Rivera.[5] While this admission may or may not provide a basis from which a reasonable jury could infer bad faith toward Rivera (which is not the issue here), it clearly does not provide a sufficient basis from which a jury could reasonably infer bad faith toward Golan. Indeed, Wayne Pingel also testified that Pingel was in fact contemplating a lawsuit against Golan when Pingel sent the October 30, 1998 cease-and-desist letter. Thus, the record shows only that Pingel did not intend to initiate suit against Rivera and does not support an inference that Pingel did not intend to initiate suit against Golan.

▬▬▬ While notifying infringers without intending to file suit may be an example of bad faith, *see Mallinckrodt*, 976 F.2d at 710, 24 USPQ2d at 1181, it is not dispositive. The decision to initiate a lawsuit often includes business-related considerations. For example, a patentee might have a good faith belief that a competitor's product infringes the patent but, for business-related reasons, determines the financial cost of enforcing the patent outweighs the recoverable damages. In such a circumstance, a patentee may elect to attempt to enforce the patent—for example by aggressively asserting its patent rights—and never intend to file suit. This

conduct is authorized under the patent laws in the absence of falsity or incorrectness, or disregard for either. *See Mikohn*, 165 F.3d at 897, 49 USPQ2d at 1312. Indeed, such conduct is commonly the first step taken to enforce one's patent rights. Thus, even if Pingel never intended to file suit, we believe this is only a factor to consider in determining whether the enforcement of a patent is in bad faith.

Since the intention to file suit is only one factor in determining bad faith, and the only evidence in the record that Pingel did not intend to file suit against Golan is based on an inference, we do not believe a reasonably jury could find that Pingel acted in bad faith in light of Golan's clear and convincing evidentiary burden.

▬▬▬ Second, the record shows that Pingel was, in fact, asserting infringement of an expired patent. A party that knowingly asserts an expired, and therefore unenforceable, patent results in a clear case of bad faith. *See Zenith Elecs.*, 182 F.3d at 1354, 51 USPQ2d at 1348. However, the record shows that Pingel was told by at least one attorney that the '921 patent did not expire until April 23, 1999. It was only at some point well after the October 30, 1998 cease-and-desist letter that Pingel became aware that the advice it received from the attorney was incorrect. While the reliance on the attorney's calculation of patent term clearly does not affect the expiration of the patent, it does negate an inference that Pingel was asserting a patent it knew to be expired, and accordingly negates a finding of bad faith.

In further support of its decision, the district court relied upon the fact that

---

5. We do not place much weight on the fact that Pingel did not intend to sue Rivera, its customer, for patent infringement, as a deci-

sion not to sue one's own customers is not particularly probative of bad faith conduct.

Pingel came to a determination of Golan's infringement in consultation with his patent attorney and later consulted with two other attorneys, both of whom confirmed that the issues were close. Golan expends considerable effort pointing out that in order to rely upon an opinion of counsel, that opinion must be credible.

As an initial note, each case Golan cites for this proposition deals with exculpatory opinions in cases of willful infringement charges or the basis for filing a lawsuit *after* filing. *See, e.g., SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 44 USPQ2d 1422 (Fed.Cir.1997); *Judin v. United States*, 110 F.3d 780, 42 USPQ2d 1300 (Fed.Cir.1997); *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 24 USPQ2d 1321 (Fed.Cir.1992); *Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 230 USPQ 81 (Fed.Cir.1986). We do not believe these cases are applicable to the facts of the present case primarily because requiring Pingel to prove that reliance on the attorneys' opinions was reasonable effectively, and improperly, shifts the burden to Pingel to prove it acted in good faith. Instead, it is Golan's burden to present affirmative evidence that Pingel acted in bad faith. *C.R. Bard*, 157 F.3d at 1369, 48 USPQ2d at 1246. At most, the evidence shows Pingel was seeking advice from counsel in ongoing contemplation whether to actually file suit against Golan. The evidence of record relating to Pingel's reliance on attorney advice, while potentially inaccurate and questionable, does not support Golan's claim that Pingel acted in bad faith. "Whether or not an opinion was 'legally' correct is not the proper focus." *Graco, Inc. v. Binks Mfg. Co.*, 60 F.3d 785, 793–94, 35 USPQ2d 1255, 1261–62 (Fed. Cir.1995) (quoting *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 830, 23 USPQ2d 1426,

1438 (Fed.Cir.1992) (holding that reliance on an attorney's oral opinion, even though it was in error, is evidence of good faith).

From the record before us, Pingel, in asserting patent infringement of the '921 patent, had no reason to believe an attorney would provide the wrong date of patent expiration. Additionally, each attorney stated that although Pingel's case might not be particularly strong, the issues were "close." Thus, we find that the evidence does not clearly show that Pingel knew the '921 patent was invalid at the time it asserted infringement or that Pingel had no reason to believe that Golan did not infringe any of Pingel's asserted patents.

### b. Trademark infringement allegations

The parties and the district court appear to have presumed that Federal Circuit law regarding bad faith governs Pingel's assertions of trademark infringement. This is not so. The law of the pertinent regional circuit governs the assertion of federally protected trademark rights. *Al–Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1326, 50 USPQ2d 1161, 1172 (Fed.Cir.1999).

If, however, Pingel had not federally registered the Power–Flo mark at the time he asserted infringement, the asserted trademark rights are entirely creatures of state or common law. If that is the case, no federal statute preempts or affects the remaining state claims. Rather, Ninth Circuit law applies to the federal Lanham Act claims predicated on the assertion of state trademark rights, and state law applies entirely to the California unfair competition and business tort claims predicated on the assertion of state trademark rights. *Thompson v. Haynes*, 305 F.3d 1369 (Fed.Cir.2002) ("In deciding non-pat-

ent issues, such as trademark, trade dress and other unfair competition issues under § 43(a) of the Lanham Act, this Court applies regional circuit law."). On remand, the district court should determine which law applies and whether Pingel's allegations of trademark infringement are actionable under that law.

## V.   CONCLUSION

In light of the record before us, we affirm the district court's grant of summary judgment in favor of Pingel on Golan's state and federal antitrust claims because Golan failed to provide evidence that Pingel possessed monopoly power in the relevant market, and the district court's determination that Pingel's facsimile statement to Rivera regarding the flow rate of the Peak Flow filter was not actionable because Golan presented insufficient evidence that the statement was untrue. We affirm the grant of summary judgment on Golan's remaining state and federal unfair competition and state tort claims because Golan has not presented clear and convincing evidence sufficient for a reasonable jury to conclude Pingel acted in bad faith. We remand to the district court to ascertain the proper application of law with respect to the trademark infringement issues.

*AFFIRMED–IN–PART, REVERSED–IN–PART, and REMANDED.*

No costs.